IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex. rel.* William Sanders, *et al.*,   )<br>)<br>) | |
|       Plaintiffs,   ) | Case No. 5:19-cv-00004 |
|   ) | |
| v.   ) | By:  Elizabeth K. Dillon |
|   ) |      United States District Judge |
| USAA FEDERAL SAVINGS BANK, *et al.*,   ) | |
|   ) | |
|       Defendants.   ) | |

**MEMORANDUM OPINION**

This is a qui tam action alleging violations of the False Claims Act (FCA).  (Second Amended Complaint (SAC), Dkt. No. 18.)  Relators are real estate agents who allege that defendants USAA Federal Savings Bank and Navy Federal Credit Union violated the FCA through their participation in programs such as the RealtyPlus program (in the case of Navy Federal) or the Real Estate Rewards Network (RERN) program (in the case of USAA), arrangements among realtors and membership groups that are made to help generate realty business.

Before the court are motions to dismiss filed by USAA and Navy Federal (Dkt. Nos. 51, 56) that have been briefed and argued.  The court will grant the motions to dismiss on a variety of grounds, including that relators' claims are based on publicly disclosed allegations and transactions and, thus, are subject to the public disclosure bar.  Dismissal will be with prejudice and without leave to amend.

Also before the court are various post-hearing motions: (1) Relators' motion to stay (Dkt. No. 66); (2) Relators' motion for leave to file supplemental brief (Dkt. No. 68); (3) Relators' motion to recognize settlement between USAA and the United States Government (Dkt. No. 69); and (4) USAA's motion for a protective order temporarily staying discovery (Dkt. No. 77). These motions will be denied for the reasons stated below.

## I.  BACKGROUND

### A.  Relators

Relators are William Sanders, a real estate broker who works for Ockuly Enterprises Inc., d/b/a Coldwell Banker Fountain Realty, in Jacksonville, North Carolina; Kathy Donham, a former real estate broker who worked for Coldwell Banker First Realty LLC, in Havelock, North Carolina; and Mark Prince, a real estate broker who works for Coastal Home Partners 2, LLC, d/b/a/ Keller Williams New Bern, in New Bern, North Carolina.  Relators Sanders and Donham were "A-Team Agents" for Cartus, a relocation company whose sister companies are national real estate brokerages, such as Coldwell Banker, Century 21, ERA, and Sotheby's.  Relator Prince is a military veteran and has been a member of Navy Federal and USAA for more than thirty years.

### B.  Navy Federal

Navy Federal is a member-owned and not-for-profit credit union serving the military, veterans, and their families.  Navy Federal offers its members services such as savings accounts, checking accounts, and money market accounts, as well as credit cards, personal loans, mortgages, and auto loans.

Navy Federal partners with Cartus, a relocation services company owned by Realogy, to offer RealtyPlus, a real estate assistance program for its members.  The program is publicly

advertised by Navy Federal and Cartus.  *See* Navy Federal, *Home Buying Made Easy: A Step-by-Step Guide*[1]; Coldwell Banker, *Navy Federal RealtyPlus Program* (2020).[2]  If Navy Federal members use the RealtyPlus program to find a real estate agent in the Cartus Broker Network, which includes real estate brokerages owned by Realogy, including Coldwell Banker and Century 21, they may be eligible to receive a cash rebate.  (SAC ¶ 3.)

Relators claim that, through Navy Federal's operation of the RealtyPlus program with Cartus, Navy Federal received referral fees and paid rebates or bonuses to its members in connection with homes secured by federally guaranteed mortgage programs.  (SAC ¶¶ 3, 14, 21, 32.)  By receiving referral fees and paying rebates to its members, and by failing to disclose the same, relators allege that Navy Federal violated the Real Estate Settlement Procedures Act (RESPA) and federal loan guarantee program eligibility requirements.  (SAC ¶¶ 21, 33, 58.)  As a result of these alleged RESPA violations, relators allege that Navy Federal's certifications to the Department of Housing and Urban Development (HUD), on Federal Housing Administration (FHA) loan applications, and to the Department of Veterans Affairs (VA), on VA loan applications, were false.  (SAC ¶¶ 24, 43, 44.)  Relators also claim that Navy Federal's annual certifications of compliance with the HUD and VA loan guarantee programs were false due to the supposed RESPA violations.  (SAC ¶¶ 25, 113, 116.)  As a result of foreclosures on federally guaranteed loans, "Defendant Lenders" made claims upon the government to recover on the loan insurance, resulting in violations of the FCA.  (SAC ¶¶ 18, 77, 81.)

---

[1]  *See* https://www.navyfederal.org/products-services/loans/mortgage/home-help/homebuying-made-easy-realtor.php.

[2]  *See* http://www.coldwellbankerackley.com/nfcu.

As noted above, Cartus and Navy Federal publicly advertise the RealtyPlus program, which has been in existence for thirty years.  *See, e.g.*, Business Wire, *Celebrating 30 Years of Saving Homebuyers Money—Navy Federal RealtyPlus Partnership with Cartus Delivering an Excellent Experience* (Sept. 12, 2019)[3]; *see also* Navy Federal, *Home Buying Made Easy: A Step-by-Step Guide* (2020); Coldwell Banker, *Navy Federal RealtyPlus Program* (2020).

Going back further, arrangements between realtors and affinity groups, including Navy Federal specifically, have been publicly disclosed in news reports for many years.  For example, a 1995 article detailed the "simple process" behind the affinity agreements, including the realty firm's sharing of a portion of their commission with the consumer (through rebate payments) and with "the referring organization and the national relocation firm that matched the customer to the agent."  Caroline E. Mayer, *Affinity Realty Deals Abound*, The Washington Post (July 1, 1995) (Ex. A, Dkt. No. 51-2).  A 1997 article detailed a similar process, explaining that "referring organizations receive a share of the transaction" from the real estate agent's commission, and that the relocation company also "receives a share."  Caroline E. Mayer, *Long & Foster, CostCo Enter 'Affinity' Deal*, The Washington Post (Dec. 20, 1997) (Ex. B, Dkt. No. 51-2).  The fees and rebates were described as "deducted from the agent's commission."  *Id.*  And a 1998 article detailed the promulgation of state statutes and regulations prohibiting certain affinity program practice, such as commission rebates, specifically mentioning Navy Federal as an association that sponsors such a program.  Kenneth R. Harney, *'Affinity' cash draws fire*, The Baltimore Sun (Mar. 15, 1998) (Ex. C, Dkt. No. 51-2).

---

[3] *See* https://www.businesswire.com/news/home/20190912005847/en/Celebrating-30-Years-Saving-Homebuyers-Money--.

## C. USAA

USAA is a federally chartered savings association that offers a wide range of financial products and services, including VA home loans, to United States military servicemen and their eligible family members.  USAA's subsidiary, USAA Relocations Services, Inc. (RRES), was a licensed real estate broker.  Mindful of the needs of military families, RRES conducted a program called the Real Estate Rewards Network (RERN) program, formerly known as the MoversAdvantage program, to offer a convenient referral network for relocating members in need of a real estate broker.  (SAC ¶¶ 13, 71.)

The RERN program operated through a co-brokerage relationship with Cartus.  The RERN program introduced willing members to a real estate broker with whom Cartus had a co-brokerage agreement.  *See* Mayer, *Affinity Realty Deals Abound*; Mayer, *Long & Foster, Costco Enter 'Affinity' Deal*; Kenneth R. Harney, *Affinity Group Rebates Become a Divisive* Issue, The Washington Post (Mar. 14, 1998), Ex. E, Dkt. No. 58-1.  If a member bought or sold a home through the RERN program, that member became eligible to receive a rebate or reward.  (SAC ¶ 48.)  This is because the real estate broker agreed to provide a portion of his or her commission to Cartus pursuant to their co-brokerage agreement.  Cartus then distributed a part of that commission to RRES pursuant to its co-brokerage relationship with RRES, and the member then received a predetermined portion of that commission in the form of a rebate or reward.  *See* CCBN, Inc., *Realogy Holdings Corp. 2015 Investor Day—Final*, Fair Disclosure Wire (Mar. 18, 2015), Ex. B, Dkt. No. 58-1; Kenneth R. Harney, *Realty Rebates Under Scrutiny*, The Miami Herald (Mar. 15, 1998), Ex. F, Dkt. No. 58-1.

The RERN program ended in 2018–19.  (SAC ¶ 96.)  It was a USAA-branded affinity program that USAA offered to members in the market to buy or sell a home.  (SAC ¶¶ 98–99.)

5

Affinity programs have existed for years in several industries, as documented in news articles and other publications.  *See, e.g.*, Harney, *Realty Rebates Under Scrutiny*; Kenneth Harney, *Real Estate Rebate Programs Under Attack*, Omaha World Herald (Feb. 6, 2000), Ex. G, Dkt. No. 58-1; Kenneth Harney, *Rebate Programs Spark a Round of Controversy; Discounts May Appeal to Customers, but Some States Aren't Too Keen on the Idea.  They Have Banned the Practice*, Orlando Sentinel (Feb. 6, 2000), Ex. H, Dkt. No. 58-1.  After investigation, the United States Justice Department has openly praised commission rebate affinity programs, even challenging their proscription by several states.  *See, e.g.*, DOJ Press Release, *South Dakota Real Estate Commission Permits Real Estate Brokers to Offer Rebates and Inducements* (Aug. 17, 2005), Ex. I, Dkt. No. 58-1; DOJ Press Release, *Justice Department Expresses Concerns to Tennessee State Legislature on Bill That Would Deny Consumer's Cash Rebates in Real Estate Transactions* (May 14, 2007), Ex. K, Dkt. No. 58-1.

Relators allege that that the RERN program violated the FCA because the RESPA and the Truth in Lending Act (TILA) prohibit the sharing of real estate commissions and paying rebates or rewards.  (SAC ¶¶ 21, 33, 46–47, 75, 121.)  As a result of these transgressions, relators claim that USAA's loan applications to HUD and the VA contained false information.  (SAC ¶¶ 24–25, 43–44, 113, 116.)  Thus, USAA is alleged to have falsely certified to the government that it fully complied with federal loan program rules, which caused the VA or FHA to issue unauthorized federally backed mortgage guaranties.  (SAC ¶ 164.)

## II.  ANALYSIS

### A.  Motion to Dismiss Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint must show more than a "sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The court is obliged to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations."  *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  However, while the court must accept the facts in the light most favorable to the nonmoving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."  *Id.*

Because FCA claims are "fraud based claims," *U.S. ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 196 (4th Cir. 2018), an FCA complaint must also comply with the heightened pleading requirements of Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), a plaintiff must "at minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455–56 (4th Cir. 2013).  Put otherwise, the complaint must identify the who, what, where, when, and how of the alleged fraud.  *U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014).  The intent of Rule 9(b) is to "prevent frivolous suits," "eliminate fraud actions in which all the facts are learned after discovery," and "protect defendants from harm to their goodwill and reputation."  *Nathan*, 707 F.3d at 456.  A failure to plead fraud with particularity under Rule 9(b) "is treated as a failure to state a claim under Rule 12(b)(6)."  *Id.*

## B. False Claims Act

The False Claims Act (FCA) protects government funds by "imposing civil liability on persons who knowingly submit false claims for goods and services to the United States." *U.S. ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 39 (4th Cir. 2016). To prevent fraud that might otherwise evade detection and to supplement government enforcement, the FCA permits a private individual, i.e., a relator, to file a civil lawsuit on behalf of the government against those who defraud the federal government. *Id.* To encourage such suits, the statute allows the relator to collect a portion of the recovery as a reward. 31 U.S.C. § 3730(b).

In pertinent part, the FCA subjects to civil liability "[a]ny person who knowingly presents or causes to be presented [to the United States Government], a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B). To state a claim under the FCA, relators must allege sufficient facts by which the court could plausibly infer that (1) defendants made false statements or engaged in a fraudulent course of conduct; (2) with the requisite knowledge; (3) the statements or conduct was material; and (4) caused the government to pay out money or to forfeit monies due on a "claim." *U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 161, 186 (D. Md. 2019) (citing *U.S. ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014)).

Given the "essentially punitive" nature of the damages available in FCA cases, the "Supreme Court has cautioned that the False Claims Act was not designed to punish every type of fraud committed upon the government." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783–84 (4th Cir. 1999) (citing *United States v. McNinch*, 356 U.S. 595, 599 (1958)); *Vermont Agency of Nat. Res. v. Stevens*, 529 U.S. 765, 784 (2000) ("[T]he current version of the

8

FCA imposes damages that are essentially punitive in nature"); *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers").  The Act "imposes liability not for defrauding the government generally; it instead only prohibits a narrow species of fraudulent activity: presenting, or causing to be presented, a false or fraudulent claim for payment or approval."  *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007).  "Therefore, a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government."  *Harrison*, 176 F.3d at 785.

## C.  Public Disclosure Bar

The purpose of the FCA, as noted above, is to prevent fraud that might otherwise evade detection by the federal government.  But a qui tam suit does not help the government if the fraud has already been uncovered.  *See U.S. ex rel. Sheldon v. Forest Labs., LLC*, Civil Action No. ELH-14-2535, 2020 WL 6545854, at *24 (D. Md. Nov. 6, 2020) (citing *Graham Cty. Soil & Water Conversation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 294–95 (2010)).  Thus, Congress has sought to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits in which a relator, instead of plowing new ground, attempts to free-ride by merely reiterating previously disclosed fraudulent acts."  *Beauchamp*, 816 F.3d at 39.

One such provision is the FCA's public disclosure bar.  As amended in 2010, the public disclosure provision states:

> The court shall dismiss an action or claim under this section, unless
> opposed by the Government, if substantially the same allegations
> or transactions as alleged in the action or claim were publicly
> disclosed—

9

> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an *original source* of the information.

§ 3730(e)(4)(A) (emphasis added).  The "original source" definition was also amended in 2010; it now includes an individual who either:

> (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

§ 3730(e)(4)(B).  Unlike the pre-2010 public disclosure bar, the current provision is not jurisdictional.  Instead, it operates as an affirmative defense.  *Beauchamp*, 816 F.3d at 40.  The amendment also "changed the required connection between the relator's claims and the public disclosure."  *Id.*  Whereas the public disclosure bar previously foreclosed claims only when the relator's suit was based on the public disclosure, the current provision "'no longer requires actual knowledge of the public disclosure, but instead applies if substantially the same allegations or transactions were publicly disclosed.'"  *Id.* (quoting *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 917 (4th Cir. 2013)).[4]  "Once a defendant files a motion to dismiss based on the

---

[4] The FCA does not have retroactive force, and, as a result, the 2010 amendments cannot be applied to cases arising before the effective date of the amendments.  *Graham Cty.*, 559 U.S. at 283 n.1.  The SAC is difficult to follow, but it does not appear to be based on any allegations of conduct occurring before March 23, 2010, the date of the amendments.  *See Fadlalla*, 402 F. Supp. 3d at 181.  The parties' briefs argue the public disclosure bar based on the

public-disclosure bar, the relator bears the burden of proving by a preponderance of the evidence that the bar does not apply."  *Ahumada*, 756 F.3d at 274.

In sum, to determine if the public disclosure bar applies, the court must ask: (1) is there a qualifying public disclosure? (2) if yes, is the disclosed information the basis of the relator's suit? (3) and, if so, is the relator the original source of that information?  *See Sheldon*, 2020 WL 654854, at *15 (citing *U.S. ex rel. Wilson v. Graham Cty. Soil & Water Conv. Dist.*, 528 F.3d 292, 308 (4th Cir. 2008)).  If the answers are yes, yes, and no, respectively, then the bar applies, and the case must be dismissed.

First, the court has cited several newspaper articles describing the Navy Federal and USAA affinity rebate programs.  *See, e.g.*, Navy Federal Exs. A–C, Dkt. No. 51-2.  These are qualifying public disclosures.  *See* § 3730(e)(4)(A)(iii) (providing that the bar applies to disclosures "in the news media").

Second, information contained in these articles form the basis of relators' suit.  For example, a Baltimore Sun article from 1998 reports that Navy Federal sponsored an affinity program, and that some affinity programs entail commission rebates from brokers who have agreed to discount fees in exchange for referrals.  (Ex. C, Dkt. No. 51-2.)  The Second Amended Complaint includes identical allegations.  (*See* SAC ¶ 31 (alleging that Navy Federal operates an affinity program), ¶ 47 (alleging that affinity programs entail commission rebates from brokers in exchange for referrals), ¶¶ 3, 14, 21, 32 (alleging that Navy Federal received a portion of the commission rebates).)

------

new version of the statute.  Therefore, the court does not perceive this to be an issue in this case and finds that the 2010 amendments are fully applicable.

A chart in USAA's brief makes the point directly:

| RELATORS' CLAIM | PRIOR PUBLIC DISCLOSURE | EXHIBIT (*see* Dkt. No. 57-1) |
|---|---|---|
| USAA FSB developed the RERN/MoversAdvantage program as an affinity program that offered services to Members through RRES and Cartus.  (SAC ¶¶ 13, 71.) | "USAA has one of the most active programs in the country, according to John Morse, executive director of USAA's MoversAdvantage." [Also involved] is the relocation company [Cartus] that links the consumer to the realty firm." —Washington Post, 1997 | Ex. D |
| USAA FSB had a referral relationship with Cartus, to help military buyer and seller leads.  (SAC ¶ 96.) | "Meet Laurance Alvarado. . . . When the Air Force captain was transferred to Washington . . . he and his wife . . . were so unfamiliar with the area, Alvarado decided he needed extra help and attention. So he sought out USAA[.] . . . With just one phone call, Alvarado was linked to a local realty firm and an agent. . . . A relocation consultant called Alvarado every other week to make sure he was getting all the help he needed . . . . But the best feature came at settlement: Simply by using USAA to find an agent, Alvarado got $800 cash back when he settled[.]" —Washington Post, 1995 | Ex. A |
| The RERN/MoversAdvantage program connected Members to a real estate broker who is part of the Cartus program. (SAC ¶ 48, 71-72.) | "USAA works with about 450 firms and 5,000 agents chosen by [Cartus]." —The Star Tribune, 1997 | Ex. M |
| The RERN/MoversAdvantage program offered participating Members a commission rebate or bonus.  (SAC ¶ 47.) | "In the USAA program, for instance, the company's 3 million member-customers are eligible to get a cash | Ex. E |

| | "bonus" ranging from $200 to $1,000 when they buy or sell a house." —Washington Post, 1998 | |
|---|---|---|
| The amount of the rebate is based on the sale or purchase price of the home.  (SAC ¶¶ 47-48.) | "Bonus ranges from $350-$1,550 based on sale price of home sold/purchased." —Business Wire, 2010 | Ex. A |
| The rebate comes from a portion of the broker's commission.  (SAC ¶¶ 47-48.) | "The bonus is actually a commission rebate[.]" —Washington Post, 1998 | Ex. E |
| The only way to receive the rebate was if the Member worked with a participating broker, who agreed to pay part of his commission to Cartus. (SAC ¶¶ 47-48.) | "The bonus [comes] . . . from participating real estate brokers who've agreed to discount their regular fees in exchange for USAA's referral of prime, prequalified clients ready to buy or sell." —Washington Post, 1998 | Ex. E |
| USAA FSB and Cartus retained a portion of the real estate broker's commission. (SAC ¶ 62) | "For its role, USAA and other referring organizations receive a share of the transaction, generally from 5 percent to 7 percent of an agent's commission. Also receiving a share is the relocation company [such as Cartus] that links the consumer to the realty firm." —Washington Post, 1997 | Ex. D |
| USAA FSB did not disclose the portion of the real estate broker's commission that USAA FSB or Cartus received.  (SAC ¶ 62.) | "USAA would not disclose how much it retains from the real estate rebates, but [a] spokesman . . . said it's basically enough to cover administrative costs. The rest is paid to the [USAA] member[.]" —The Star Tribune, 1997 | Ex. M |

Relators argue that the allegations in the SAC are not substantially the same as the

information contained in these newspaper articles because the articles do not state a fraudulent

act.  Although the Fourth Circuit has "not yet interpreted" the post-2010 language in the public

disclosure bar—which applies where "substantially the same allegations or transactions were

publicly disclosed"—"other circuits look to whether the disclosures provide enough information

so that the government could investigate the case and . . . make a decision whether to prosecute."

*Fadlalla*, 402 F. Supp. 3d at 183.  As a general matter, a "public disclosure occurs when the

essential elements exposing the particular transaction as fraudulent find their way into the public

domain."  *U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016).

This type of disclosure can occur either through a "direct allegation of fraud" or through the

revelation of "both a misrepresented state of facts and a true state of facts so that the listener or

reader may infer fraud."  *Id.*  That the disclosure does not use "magic words or specifically label

disclosed conduct as fraudulent" has been dismissed as "quibbling."  *Id.* at 209 (rejecting

argument that "disclosures showed only a price gouging scheme, not a scheme to defraud").

Relators claim to have uncovered the true nature of the "scheme," purportedly providing

the "exclusive knowledge that the bonus or rebate is tied to the referral of business for each

transaction."  (Dkt. No. 59-1 at 14.)  As set forth in the above chart, this information was

reported by the Washington Post in 1998: "The bonus [comes] . . . from participating real estate

brokers who've agreed to discount their regular fees in exchange for USAA's referral of prime,

prequalified clients ready to buy or sell."  (USAA Ex. E, Dkt. No. 57-1.)  Substantially the same

allegations have been publicly disclosed, and it matters not that the conduct was not specifically

labeled as fraudulent.

As the foregoing makes clear, the answer to the first two questions— (1) is there a

qualifying public disclosure? and (2) is the disclosed information the basis of the relator's

suit?—is yes to both.  Thus, the only issue is to determine if the relators are the original sources

14

of this information.  The answer to that question is no.  Relators are third-party real estate agents, not Navy Federal or USAA insiders.  Importantly, relators do not plead particularized details about a scheme to defraud, which would suggest insider knowledge.  Plaintiffs argue that relator Prince, as a Navy Federal *member* (not employee), has insight into the "inner workings" of Navy Federal and thus brings "unique, unknown, and unpublicized insider information."  (Dkt. No. 53-1 at 5–6.)  Yet relators do not claim knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, nor did relators voluntarily provide the information to the government before filing this action.  *See* § 3730(e)(4)(B)(2); *see also Fadlalla*, 402 F. Supp. 3d at 184–85 (finding that relators are not an original source because they did not "materially add" to the public disclosures by making a contribution that "adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue'") (quoting *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016)).

For these reasons, relators' claims are barred because they are based on allegations that have been publicly disclosed.

**D.  Submission of Claim**

As noted above, a "central question" in creating FCA liability is the submission of a false claim to the government.  *Harrison*, 176 F.3d at 785.  It is the "sine qua non" of a False Claims Act violation.  *U.S. ex rel. Clausen v. Lab Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). Courts in the Fourth Circuit require a relator to plead the who, what, when, where, and how of at least one claim that is specifically identified as false.  *See Va. ex rel. Hunter Labs., LLC v. Quest Diagnostics, Inc.*, No. 1:13-cv-1129 (GBL/TCB), 2014 WL 1928211, at *7 (E.D. Va. May 13, 2014) (holding that the Fourth Circuit appears to require "identification of at least one

representative claim" to satisfy Rule 9(b)).  "When a defendant's actions, as alleged and as reasonably inferred from the allegations, *could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment."  *Nathan*, 707 F.3d at 457 (emphasis in original).

Relators allege that defendants "made false demands for payment" after some unspecified loans "went into default and/or foreclosure, resulting in a claim on the guaranty."  (SAC ¶ 77.) This is insufficient because Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payment must have been submitted, were likely submitted or should have been submitted to the Government."  *Nathan*, 707 F.3d at 457.  Rather, Rule 9(b) requires the complaint to provide "some indicia of reliability" to support an allegation that an actual false claim was in fact presented to the government.  *Id.*; *see also U.S. ex rel. Rauch v. Oaktree Med. Centre, P.C.*, No. 6:15-cv-01589-DCC, 2020 WL 1065955, at *13 (D.S.C. Mar. 5, 2020) (dismissing FCA claim where complaint did not identify "a single false claim that was presented to the Government for payment" but instead "alleged—in broad strokes—a series of schemes that they declare are unlawful").  No such indicia is provided in the complaint.

Ultimately, relators concede that they failed to plead that either Navy Federal or USAA submitted a claim for insurance payment on a defaulted, government-backed mortgage.  (Dkt. No. 53-1 at 37; Dkt. No. 59-1 at 26.)  Instead, relators point to examples of loans by other lenders, such as Wells Fargo, that "went into default and/or foreclosure, resulting in a claim on the guaranty," which relators argue are "representative of the scheme," and, thus, relators need

16

not identify any claims for government payment by the defendants in this action.  (SAC ¶ 77; Dkt. No. 53-1 at 37; Dkt. No. 59-1 at 26.)

Relators rely on Ninth Circuit precedent which holds that there "is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct.  A good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts."  *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (citing *U.S. ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016)).  In *Silingo*, the complaint was faulted for using "collective allegations to refer to the defendants rather than differentiating among them."  *Id.*  Unlike in the Ninth Circuit, collective pleading in the Fourth Circuit does not satisfy the particularity requirements of Rule 9(b).  *See U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 526 (D. Md. 2006), *aff'd in part, dismissed in part*, 237 F. App'x 802 (4th Cir. 2007) ("[W]hen a relator raises allegations of fraud against multiple defendants, the complaint must apprise each defendant of the specific nature of his or her participation in the fraud.").  More to the point, unlike the Ninth Circuit, which does "not require the complaint to identify representative examples of actual false claims," 904 F.3d at 678, the Fourth Circuit requires "identification of at least one representative claim" to satisfy Rule 9(b), *Hunter Labs.*, 2014 WL 1928211, at *7.  Relators have not identified any claim by either defendant.

Relators emphasize the Ninth Circuit's distinction between "chain" and "wheel" conspiracies, analogizing this case to the latter.  "In the taxonomy of conspiracy theories, a 'chain conspiracy' is one in which 'each person is responsible for a distinct act within the overall plan,' while a 'wheel conspiracy' involves 'a single member or group (the 'hub') separately agree[ing]

17

with two or more other members or groups (the 'spokes').'" *Silingo*, 904 F.3d at 678 (quoting *Conspiracy*, Black's Law Dictionary (10th ed. 2014)).  If a fraudulent scheme "resembles a chain conspiracy, then a complaint must separately identify which defendant was responsible for what distinct part of the plan," but "if a fraudulent scheme resembles a wheel conspiracy, then any parallel actions of the 'spokes' can be addressed by collective allegations." *Id.*  The *Silingo* court emphasized that a "good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts," 904 F.3d at 677, but in the absence of a "representative claim" by either defendant, the distinction is not relevant.

Nor is this a case where, as described in *Nathan*, "a defendant's conduct necessarily led to submission of false claims and so presentment need not be explicitly alleged." *U.S. ex rel. Branscome v. Blue Ridge Home Health Servs., Inc.*, Civil Action No. 7:16cv00087, 2018 WL 1309734, at *3 (W.D. Va. Mar. 13, 2018) (discussing *Nathan*, 707 F.3d at 456–57).  The *Nathan* court discussed two examples of these types of cases.  707 F.3d at 457 (citing *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) and *U.S. ex rel. Duxbury v. Ortho Biotech Prods., LP*, 579 F.3d 13 (1st Cir. 2009)).  In *Grubbs*, for example, the relator alleged a conspiracy by doctors to seek reimbursement from governmental health programs for services that were never performed.  Because the complaint included the dates of specific services that were recorded by the physicians but never provided, it would "stretch the imagination" for the doctors to continually record services that were not provided, but to "deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed."  565 F.3d at 192.  Similarly, in *Duxbury*, in a scheme alleging kickbacks to health care provides, allegations regarding "the dates and amounts" of false claims filed by providers with Medicare met the Rule 9(b) standard.  579 F.3d at 30.  Here, by contrast, the only way a claim would necessarily be

18

presented is if a government-backed Navy Federal or USAA loan went into default. The

inevitability of presentment cannot be inferred when the complaint does not allege that any such

loans went into default. *See, e.g.*, *Nathan*, 707 F.3d at 458 ("Relator does not allege in the

amended complaint that the targeted rheumatologists wrote any off-label prescriptions that were

submitted to the government for payment, a critical omission in a case brought under the Act.");

*id.* at 459 ("[E]ven if Relator had pleaded adequately that the 98 prescriptions were written at the

60 mg dosage level, the existence of a 60 mg prescription written by a PCP would not itself

constitute a plausible allegation that the prescription was for an off-label use."); *Branscome*,

2018 WL 1309734, at *3 ("Branscome presents no allegations that would provide evidence of

firsthand knowledge of the alleged fraudulent scheme; there is no explicit connection between

services and billing because the complaint does not allege that any of the listed patients were

Medicare beneficiaries; and the lack of connection between services and billing undercuts using

Owens' notes to the lead to the 'logical conclusion' of presentment.").

      Finally, relators cite several HUD-1 Settlement Statements from loans originated by

USAA and Navy Federal, attached as exhibits to their complaint. (*See* Dkt. No. 1, Exs. 26, 27.)

At best,[5] these are "inchoate violations" because a lender's "mere application for insurance under

a government loan program is not a 'claim'" within the meaning of the FCA. *United States v.*

*McNinch*, 356 U.S. 595, 598 (1958). Following *McNinch*, court have uniformly held that an

inchoate violation does not suffice to state a viable FCA claim. As the D.C. Circuit explained:

> [T]he false application for a guaranteed loan . . . establishes only
> an 'inchoate' violation of the [FCA] that does not ripen into a
> claim actionable under the statute until a later event of legal

---

[5] Many of the loans are conventional loans, not government-secured loans.

> consequence between the lender and the government . . . . [A]n actual payment to the lender qualifies as the event that effectuates the 'claim' for the government has 'disbursed funds.'

*United States v. Van Oosterhout*, 96 F.3d 1491, 1494 (D.C. Cir. 1996) (quoting *McNinch*, 356 U.S. at 599).

As the Fourth Circuit has emphasized, the "critical question" for FCA claims is "whether the defendant caused a false claim to be presented to the government, because liability under the Act attaches only to a claim actually presented to the government for payment, not to the underlying fraudulent scheme." *Nathan*, 707 F.3d at 456.   Because relators have failed to allege with particularity that specific false claims were presented to the government for payment, the FCA claims will be dismissed.

## E. Materiality

Materiality for purposes of § 3729(a)(1)(A) "looks to the effect on the likely or actual behavior of the recipient of the misrepresentation." *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016).  The FCA's materiality standard is "demanding." *Id.* at 2003.  "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular . . . requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*

Relators plead that noncompliance with unspecified RESPA and TILA rules made defendants' allegedly false certifications "material as a matter of law."  (SAC ¶¶ 26–28.)  This conclusory allegation is insufficient to meet the "demanding" standard set forth in *Escobar*.  136 S. Ct. at 2003 (stating that materiality can include evidence that the defendant knows that the government consistently refuses to pay claims based on statutory, regulatory, or contractual

noncompliance).  Moreover, after being served with the complaint, and with "written disclosure of substantially all material evidence and information" relators possessed, 31 U.S.C. 3730(b)(2), the government declined to intervene in this matter.  (Dkt. No. 19.)  Also, relators do not allege that the government ever stopped paying loan guaranty claims; relators *concede* in their allegations that the government views defendants as qualified lenders authorized to issue VA loans.  (SAC ¶¶ 37–38, 211–13 (alleging that the government "may continue to be" damaged).  Pursuant to *Escobar*, courts have dismissed claims based on the government's continued payment of claims or other inaction after obtaining knowledge of alleged misconduct.  *See, e.g.*, *U.S. ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481, 487 (3d Cir. 2017); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 763–64 (3d Cir. 2017) (affirming judgment because government knew about the alleged conduct and regularly paid the type of claims at issue).

Moreover, any inference of materiality is undermined by an alternative remedial scheme that does not require repayment for administrative violations.  *See, e.g.*, *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010) ("[T]he Government's ability to seek a range of remedies in the event of noncompliance suggests that payment is not conditioned on a certification of compliance."); *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 310 (3d Cir. 2011) (finding "perfect compliance" with regulations not an absolute condition of payment where government has established an administrative mechanism for managing and correcting violations).   Here, RESPA violations are omitted from the enumerated situations where a mortgagee must indemnify an FHA payment for regulatory violations.  *See* 24 C.F.R. § 203.255(g).

For these reasons, relators fail to meet the pleading requirements for materiality.

**F.  Reverse False Claim**

Relators bring a claim under the "reverse false claim" subsection of the FCA (also known as the "retention of proceeds provision"), which imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  § 3729(a)(1)(G).  To prove a claim under subsection (a)(1)(G), a plaintiff must show: (1) proof that the defendant made a false record or statement, (2) at a time that the defendant had a presently-existing obligation to the government—a duty to pay money or property.  *U.S. ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 268 (S.D.N.Y. 2020).  Direct and reverse false claims are "mirror images of one another—both result in a loss to the Government."  *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 255 (D.D.C. 2016).

First, the obligations alleged by relators are obligations to report, not obligations to pay the government.  (SAC ¶¶ 191, 192 ("Defendant Lenders . . . have a duty to immediately self-report findings of fraud").)  The government's "ability to pursue reimbursement for overpayments or fraudulently induced payments does not constitute an 'obligation.'"  *Fadlalla*, 402 F. Supp. 3d at 191 (quoting *Landis*, 160 F. Supp. 3d at 269)).  At its essence, a "reverse" false claim action involves "a false statement made to knowingly avoid having to pay the government when payment is otherwise due."  *Branscome*, 2018 WL 1309734, at *5.

Second, relators' reverse false claim is based on the same conduct as their claims under 3729(1)(A).  *See, e.g.*, *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338 (S.D.N.Y. 2004)

(holding that "conduct that gives rise to a traditional presentment or false statement action" cannot also satisfy "the demands of section 3729(a)(1)(G)")).

For these reasons, relators failed to state a reverse false claim under the FCA.

## G. Conspiracy

Finally, relators also allege an unlawful FCA conspiracy.  § 3729(a)(1)(C).  To state an FCA conspiracy claim, a plaintiff must allege that the defendant "conspired with one or more persons to have a fraudulent claim paid by the United States, that one or more conspirators performed any act to have such a claim paid by the United States, and that the United States suffered damages as a result of the claim."  *United States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 50 (D.D.C. 2011).  Plaintiff must also plead that the alleged conspirators "had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim."  *Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008).

A conspiracy claim is premised on the underlying FCA claims; thus, it "rises and falls with the individual claims."  *U.S. ex rel. Hedley v. Abhe & Svoboda, Inc.*, 199 F. Supp. 3d 945, 956 (D. Md. 2016) (citing *U.S. ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407, 413 (4th Cir. 2010)).  Because relators failed to plead a predicate violation of the FCA, their conspiracy claim must be dismissed.

## H. Leave to Amend

Relators have requested leave to amend if the court were to grant defendants' motion to dismiss.  Leave to amend should be freely granted "when justice so requires," Fed. R. Civ. P. 15(a)(B)(2), but should be denied "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be

23

futile." *McKeown v. Rahim*, No. 7:18-CV-00306, 2020 WL 1250499, at *12 (W.D. Va. Mar. 16, 2020) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)).

Here, amendment would be futile because there are several insurmountable obstacles to pleading an actionable claim, particularly the public disclosure bar.  Moreover, amendment would be prejudicial because the operative complaint, filed on May 6, 2020, is relators' second amended complaint.  (Dkt. No. 18.)  Relators do not deserve a third bite at the apple.  The court will therefore dismiss this action with prejudice.

## I.  Motion for Leave to File Supplementary Brief

More than five months after briefing was completed and the court held oral argument on the motions to dismiss, relators have filed a motion for leave to file a supplementary brief.  (Dkt. No. 68.)  Relators explain that they recently discovered that USAA was fined $85 million in an Office of the Comptroller of the Currency Consent Order filed in October 2020.  The supplemental brief explicates facts which, according to relators, support their position that USAA was fined and/or ordered to pay restitution to members of the USAA Real Estate Rewards Network for underlying claims presented in the relators' Second Amended Complaint.  If the foregoing is true, according to relators, they could satisfy the materiality requirement set forth in *Escobar*, discussed above.

As an initial matter, litigants cannot amend their pleadings through briefing, and relators have not filed a motion for leave to amend.  "It is well-established that parties cannot amend their complaints through briefing."  *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  Moreover, even if, as relators suggest, this new information would enable them to satisfy the materiality requirement, the Second Amended Complaint is subject to dismissal for several other reasons, including the

public disclosure bar.  Accordingly, the court will deny the motion for leave to file a supplemental brief.

**J.  Motion to Recognize Settlement**

In this motion, relators ask the court to recognize a settlement between USAA and the federal government, and to award an appropriate share in the recovery.  (Dkt. No. 69.)  Here, relators again refer to USAA's fine pursuant to an OCC Consent Order in October 2020. Relators state that if any of the underlying claims found in the case before this court match any of the claims found in the settlement agreement of the OCC Consent Order, it constitutes an alternate remedy to a civil qui tam action, entitling relators to intervene in the civil action to protect their rights and recover a share of the proceeds.

Given the court's analysis of relators' claims and its determination that the claims should be dismissed with prejudice, the court will deny relators' motion.  *See, e.g.*, *United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 522 (6th Cir. 2007) ("Absent a valid complaint which affords a relator the possibility of ultimately recovering damages, there is no compelling reason for allowing a relator to recover for information provided to the government.") (discussing a motion to recognize a settlement); *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 111 (3d Cir. 2007) ("[A] valid qui tam action is a prerequisite to a relator's right to recover.").[6]

---

[6]  Relators withdrew their motion to stay (Dkt. No. 67), so that motion will be denied as moot.  USAA's motion to stay (Dkt. No. 77) will also be denied as moot.

## III.  CONCLUSION

For the reasons stated herein, the court will grant defendants' motions to dismiss and dismiss this action with prejudice.  The court will also deny relators' motions for leave to file a supplementary brief, its motion to recognize settlement, and deny USAA's motion to stay. Relator's motion to stay was withdrawn.  The court will enter an appropriate order.

Entered: August 10, 2021.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
United States District Judge

26